Memorandum of Decision
On July 1, 1998. the Department of Children and Families (DCF) filed petitions to terminate the parental rights of Melissa M. and Javier N. to their children JayQuan M. and JayQuanna N. A trial on these petitions took place on September 14 and 16, 1998. For the reasons stated below. the Court grants the petitions to terminate parental rights.
FACTS
The Court finds the following facts and credits the following evidence.
A. JayQuan
JayQuan was born on March 18, 1995, making him three and one-half years old at the time of trial. Both mother and child tested positive for cocaine at the time of birth. After JayQuan's birth, DCF received several referrals concerning mother, ranging from lack of planning to handling her child in a rough manner. On May 8, 1996, when JayQuan was fourteen months old, the Court entered judgment adjudicating him to have been neglected and committed him to DCF. The Court has granted extensions of the commitment through May 8 1999. On April 23, 1997, the Court found that continuing efforts to reunify the child with his parents were no longer appropriate.
JayQuan has remained in foster care to the present time. He has been enrolled in special education classes because he was withdrawing at school and engaging in property destruction. His speech is delayed. He is an active boy and his gross motor skills appear to be developing well. When visited by his father, JayQuan was sullen and withdrawn even though father was attempting to play with him in an appropriate manner. According to Dr. Ruth M. Grant, a psychologist who testified at trial, JayQuan's tendency CT Page 11441 to withdraw appears to stem from the psychological trauma often due to neglect during infancy. Dr. Grant felt that JayQuan is developing an attachment disorder, which involves an inability to express affection, difficulties in bonding, and a tendency to become depressed. JayQuan needs a stable and consistent environment where he can obtain special education and possibly therapy.
JayQuan has bonded with his foster mother. She appears to be the only one who can reach him when he withdraws. The foster mother is knowledgeable about and sensitive to JayQuan's special needs. The foster parents would like to adopt JayQuan and DCF would like the foster parents to do so.
B. JayQuanna
JayQuanna was born on June 30, 1996, and was over two years old at the time of trial. She was born fourteen weeks premature and weighed one pound. fifteen ounces at birth. Her mother had poor prenatal care and tested positive for marijuana at the time of her hospital admission for delivery. JayQuanna had meningitis in October, 1996. For these reasons, JayQuanna remained hospitalized for all or most of the period through October, 1996.
JayQuanna has been living with JayQuan and his foster family since her discharge from the hospital. On November 3, 1996, the Easter Seals Rehabilitation and Health Care Center of Waterbury enrolled JayQuanna in its Birth to Three Program. On December 18, 1996, the Court adjudicated JayQuanna to be neglected and committed her to DCF custody. Her current commitment expires on December 18, 1998. The Court has not previously made a finding concerning the propriety of continuing efforts to reunify the parents with JayQuanna. The State, in a motion filed August 18, 1998, has asked that the Court make such a finding as part of this, ruling.
JayQuanna has significant delays in receptive and expressive language, and in cognitive, personal, social, and adaptive self-help skills. At age two JayQuanna would say "uh-oh," but had not begun to make other two syllable sounds such as "Mama" or "Dada." She may need to learn sign language to help her communicate. JayQuanna also has chronic asthma that causes breathing difficulties and congestion. JayQuanna needs a consistent and stable home that will afford her the attention and care she needs for her multiple problems. CT Page 11442
Despite these problems, JayQuanna is a personable and warm child who shows interest in JayQuan and her foster mother. The foster mother is very affectionate toward JayQuanna and is knowledgeable about her medical condition. They have bonded. The foster parents would like to adopt JayQuanna and DCF would like the foster parents to do so.
C. The Mother
The mother, Melissa M., did not appear at trial. At the time of trial, she was twenty-six. The mother dropped out of high school in her junior year. At some point in Melissa's youth, her mother died and Melissa had a nervous breakdown. As a result, Melissa has received Social Security disability payments. In 1995, the mother was diagnosed as having a moderately severe personality disorder and a low IQ. At the time of JayQuan's removal, the mother was supporting herself on $300.00 she earned weekly providing child care.
The mother visited her children regularly from September, 1996, through December, 1996, but has not visited them since. DCF referred the mother to two different substance abuse or other general counseling agencies and monitored her participation at a third. The mother attended one program inconsistently, attended only the initial appointment for a second program, and did not show up at all for the third program. In October, 1997, the mother was arrested on drug charges and remained incarcerated until December, 1997. Upon her release, DCF set up a visit with her children, but the mother did not show up. The mother has not contacted DCF since that time.
D. The Father
At the time of trial, the father, Javier N., was nineteen years old. He was raised by his mother, who was a single parent. Javier dropped out of high school in his freshman year after being expelled for missing school. He apparently met Melissa in 1994, when she moved into his family's house. During Melissa's pregnancy in late 1994 and early 1995, Javier was fifteen years, old. He was aware that Melissa was using illegal drugs during her pregnancy and tried to dissuade her from doing so. Several months after JayQuan's birth, a fight broke out near Javier's house and Javier and others were arrested. At that time, DCF took custody of JayQuan. CT Page 11443
By the time Melissa gave birth to JayQuanna in June, 1996, Javier was living in Bridgeport and "on vacation" in Waterbury. He was aware that JayQuanna was a premature baby with problems, although he visited the baby at the University of Connecticut hospital in Farmington only once or twice, apparently because of transportation difficulties. The hospital attempted to call the father daily during JayQuanna's hospitalization, but the father ultimately had no phone service available to him. In November, 1996, the father was arrested again for breach of the peace. Shortly thereafter, DCF took custody of JayQuanna.
The father visited the children regularly from September through December, 1996, but missed five of the next six visits in early 1997. He was referred by the criminal court to the Powerline program, which attempts to rehabilitate accused and convicted persons, but missed fifteen days from December, 1996 through February, 1997. The father also tested positive for THC, which is the active ingredient in marijuana, on at least two occasions during this time period. During the same time, the father also was inconsistent in attending the Southwest Community Clinic.
Beginning in late 1997, after DCF filed the termination petition, the father began to rehabilitate himself and act more responsibly. The father enrolled in a partial hospitalization program at the Guenster Clinic. There, he consistently tested negative for drugs. His visitation with the children became more regular in 1998. During one monitored visit in April, 1998, the father showed warmth and affection towards his children, even though neither child recognized him as a parent. The father again participated in the Powerline program, apparently because of a court referral based on the second breach of peace arrest, and this time he reported as required, tested negative for drugs, and obtained a part-time job. The State eventually nolled all charges against the father, at least in part because of a favorable report from Powerline. The father enrolled himself in a program at the Hall Neighborhood House to assist him in getting an education and a job. Although he did not complete the program due to a disagreement over scheduling, the father did obtain other part-time jobs and has taken some steps towards enrolling in a GED program.
The father, however, still has problems to overcome. He never married Melissa and does not know where she is now. Based on CT Page 11444 psychological testing, the father has an oppositional defiant disorder, which means that he can be defiant of authority and resistant to change. Up until one month before trial, the father was receiving Social Security disability. At the time of trial, the father was not working, was not in school, nor in any counseling program. Instead, he was at home with his fiancee. Bertha P., and their newborn son. Bertha is also nineteen and has medical problems.
The father testified at trial. At age nineteen, he is both old and young. He is old because he is already the father of three children and has made strides on his own to become productive despite the lack of education, family support, and economic resources. But he is also young, even beyond the fact that he is a teenage father. The father is unsophisticated and lacks knowledge about the special needs of JayQuan and JayQuanna. He also has no steady employment and no bright employment prospects. He is still recovering from a difficult adolescence.
ADJUDICATION
A. Reunification
In order to terminate parental rights, the State must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. sec. 17a-112(c)(1). The Court need not make such a finding, however, "if a court has determined at a hearing pursuant to subsection (b) of section17a-110 [dealing with permanency planning for committed children] that such efforts are not appropriate." Id. As stated, the Court has already made such a finding for JayQuan. With regard to JayQuanna, DCF set expectations, offered visitation with transportation, and referred the parents to substance abuse and other rehabilitation programs. The Court finds that DCF has made reasonable efforts to locate the parents and reunify them with JayQuanna and that the parents, particularly Melissa, have been unable or unwilling to benefit from these efforts.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, the State must also prove that one of several statutory CT Page 11445 grounds for termination exists. See In re Michael B.,49 Conn. App. 510, 512 (1998). General Statutes sec. 17a-112(c)(3) requires that, with one exception not pertinent here, these grounds must have existed for at least one year unless the Court waives the one year requirement based on the standards set forth in sec. 17a-112(d).[2] In this adjudicatory phase, the Court is limited to events preceding the filing of the petition or the latest amendment. See Practice Book sec. 33-3(a). The relevant date in this case is July 1, 1998.[3]
The State in this case has alleged the grounds of abandonment, failure to rehabilitate, and lack of an on-going parent-child relationship with regard to both parents and both children. The State alleges that these grounds have existed for more than one year for JayQuan and seeks a waiver of the one-year requirement for JayQuanna.
1. Abandonment
General Statutes sec. 17a-112(c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of the child." In reMigdalia M., 6 Conn. App. 194,208-209, cert. denied,199 Conn. 809 (1986). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id. at 209. The statutory term "maintain" implies a "continuing, reasonable degree of concern." Id. at 210.
The parents in this case failed even to see their children during the first half of 1997. There is no evidence of any financial support or any other "continuing reasonable degree of concern" by either parent prior to the filing of the termination petition. The Court concludes that the State has proven abandonment by both parents.
2. Failure to Rehabilitate
A second statutory ground for termination arises when "the CT Page 11446 parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes sec. 17a-112(c)(3)(C). The statute requires the Court to analyze the parents' rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable `within a reasonable time."' In re Luis C.,210 Conn. 157,167(1989). The statute, however, does not require parents "to be able to assume full responsibility for a child, without the use of available support programs." In reJessica M., 49 Conn. App. 229, 240 (1998) (internal citation omitted).
No dispute exists that the Court has previously found both children to have been neglected. At trial, the State commendably took a broad view of the statute that would allow the Court to consider the parents' conduct after the filing of the termination petition for the purpose of determining whether the facts "encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes sec. 17a-112(c)(3)(C). In the case of the mother, given her failure to complete any rehabilitative program and her failure even to appear for trial, the conclusion that she has failed to rehabilitate herself is straightforward.
The father's case is closer, because he has taken steps to rehabilitate himself after the filing of the petition and he has made some progress. Without discrediting these efforts, the Court nonetheless finds that the father has failed to meet the statutory standard. As stated, the father is still young, unskilled, and uneducated and now has the responsibility of a newborn boy. The children in this case have special needs. Juxtaposing these life stories, the Court does not believe that, within a reasonable time, considering the age and needs of JayQuan and JayQuanna, the father could assume a responsible position in their lives.
3. No On-Going Relationship
The third statutory ground alleged in this case is that there is "no on-going parent-child relationship, which means the CT Page 11447 relationship that develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." General Statutes sec. 17a-112(c)(3)(D). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced." In re Juvenile Appeal(Anonymous), 181 Conn. 638,645 (1980) (internal citation omitted). "In either case the ultimate question is whether the child has no present memories or feelings for the natural parent." Id. at 646.
The Court finds that the parents do not have an on-going relationship with JayQuan. His natural mother has not visited him for almost two years. Although the father has visited, and displayed warmth and affection toward his son, JayQuan does not have a positive recognition of Javier as his natural father. With regard to JayQuanna, the Court must consider whether the parents have any positive feelings, because JayQuanna's removal by the State from parental custody shortly after birth, coupled with JayQuanna's young age, makes it difficult to determine whether she has positive feelings towards her parents. See In re ValerieD., 223 Conn. 492, 532 (1992). Simply put, the evidence reveals that the mother has no positive feelings towards JayQuanna and that the father does. Accordingly, the Court finds that the State has proven the absence of an on-going relationship between the mother and JayQuanna but not between the father and JayQuanna.
4. One Year Requirement
The Court finds that the conditions supporting the termination of parental rights to JayQuan existed for more than one year prior to filing of the petition. The Court makes the same finding for JayQuanna even though she was only one year and one day old at the time of filing. Although the parents did visit her during the latter part of 1996, on the whole, especially given the parents' illegal drug use in 1996 and the first half of 1997, the statutory grounds existed during the initial one year period. Moreover, the Court can waive the one year requirement if it finds that "[f]rom the totality of the circumstances surrounding the child that such a waiver is necessary to promote CT Page 11448 the best interest of the child." General Statutes sec.17a-112(d)(1). Based on the discussion that follows of the best interests of the child, the Court waives the one year requirement to the extent necessary to sustain this decision.
DISPOSITION
In the dispositional phase of a termination case, the Court must consider whether the State has proven by clear and convincing evidence that "termination is in the best interest of the child." General Statutes sec. 17a-112(c)(2). The Court can consider all events occurring through the close of the dispositional hearing. Practice Book sec. 33-5. In arriving at a decision, the Court must consider and make written findings regarding seven factors set out in General Statutes sec.17a-112(e). See In re Tabitha P., 39 Conn. App. 353,362(1995). A discussion of these factors follows.
1. The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
The Court finds that DCF provided foster care for the children and offered the parents visitation with transportation and drug and alcohol counseling. In addition, the mother had the opportunity to receive assistance from the South West Community Center and the father did receive assistance from Powerline, a court referral program. These services were relevant to the needs of the parties and were offered in a timely manner.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
DCF offered the parents appropriate services, guidance, and sufficient time to permit family reunification
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
At the time of commitment of JayQuan, the Court approved the following expectations: (1) keep all appointments set by or with DCF, (2) Keep whereabouts known to DCF and your attorney, (3) CT Page 11449 visit the child as often as DCF permits, (4) participate successfully in counseling, (5) (for Javier) participate in a psychological evaluation and follow the recommendations of the evaluator, (6) sign releases as requested by the evaluator, (7) secure and maintain adequate housing and income, (8) no substance abuse, (9) no further involvement with the criminal justice system, and (10) specific expectations regarding living arrangements to be set once the above conditions were met. The Court reimposed expectations number 1, 2, 3, 7, 8, and 9 at the time of JayQuanna's commitment. As detailed above, DCF substantially met its obligation to provide assistance. The parents' compliance with these expectations prior to the filing of termination petitions was poor. After the filing of the petitions, the father substantially complied with the expectations, but the mother did not.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
The children are bonded to their present foster family. They are not bonded to their natural parents.
5) The age of the child.
JayQuan is currently three and one-half. JayQuanna is currently two years and three months old. They have lived most of their lives in foster care. Our Supreme Court has long recognized the deleterious effect of prolonged temporary care of abused and neglected children. See In re Juvenile Appeal (83-CD),189 Conn. 276, 292 (1983). The Appellate Court has also observed that "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence in custody cases." In re Alexander V., 25 Conn. App. 741, 748 (1992). Thus it is not in the best interests of the children to keep them in temporary foster care settings for the purpose of giving the parents more time to rehabilitate themselves.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interests of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to CT Page 11450 reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
The mother has not made any meaningful attempt to adjust her circumstances or conditions to facilitate reunification. Since the filing of the termination petition, the father has made some efforts to adjust his circumstances, but he now has another child and he remains young, uneducated, and unemployed. In sum, his parenting skills and means are limited and the special needs of his first two children are considerable. The father's circumstances simply do not meet the children's needs.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
Based on, the evidence, the only possibly relevant factor is the indigence of the parents. Nonetheless, DCF did offer to provide transportation to visits with the children, and various job training and educational programs were available. Parents who devotedly care for their children have overcome difficult economic circumstances, but the parents in this case have not yet done so.
CONCLUSION
Based upon the foregoing findings, the Court determines that it is in the best interest of JayQuan and JayQuanna for a termination of parental rights to enter with respect to the mother, Melissa M., and the father, Javier N. Accordingly, the Court hereby terminates their parental rights. The Court further orders that the Commissioner of DCF is appointed statutory parent for these children for the purpose of securing an adoptive family. If the foster parents are willing to adopt, it is the Court's direction that they receive first consideration. The Commissioner shall file with this Court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered. CT Page 11451
Carl J. Schuman Judge, Superior Court